**MODIFY and AFFIRM; and Opinion Filed May 28, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00294-CR**

**ADRIAN RACHOD DRUMMOND, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-58574-N**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Murphy, and Fillmore
Opinion by Justice Lang-Miers

Appellant Adrian Rachod Drummond appeals his conviction for aggravated robbery with a deadly weapon. After appellant pleaded not guilty, a jury convicted him and assessed his punishment at twenty-seven years' imprisonment and a $10,000 fine. In two issues on appeal, appellant argues that the evidence was insufficient to support the conviction and requests that we reform the judgment to reflect the correct names of the prosecuting attorneys in the trial court. Because all dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.2(a), 47.4. We modify the trial court's judgment and affirm as modified.

BACKGROUND

Appellant was charged by indictment with aggravated robbery with a deadly weapon. *See* TEX. PENAL CODE ANN. § 29.03 (West 2011). At trial, the State presented the testimony of complainant, an eyewitness, and a detective and officers of the Dallas Police Department. Complainant testified that he was driving home after work one evening when he stopped at a convenience store that he often visited during his commute to purchase a lottery ticket. Complainant testified that he scratched off the lottery ticket in his car and found that he had won fifty dollars, and then went back into the store, obtained his fifty dollars, and came out of the store. When complainant was going into the store, two young men approached him and one asked complainant if he would like to buy a CD. Complainant replied that he would like to purchase a reggae CD. Complainant testified that, when the men told him that another person would get the CD for him, he said that he could wait. Then a car approached and one of the two men got into the car to talk to the person in the car. When he got out of the car, he carried a bag that had something inside it. Complainant testified that the man asked complainant to go to the corner of the store because they did not want to sell the CD in front of the store "[b]ecause he said the store before had been harassing them for hanging around." Complainant testified that he spoke with the two men "[m]aybe 15 to 20 minutes or something like that" and that he was "able to get a pretty good look at their faces[.]"

Complainant further testified that, when they walked to the corner of the store, "the one that ha[d] the dreads" pointed a gun at his head and then both men began "hitting [him] down" by striking complainant on his face. Complainant testified that he saw the gun, and that the man with the gun was behind him and the other man was in front of him. Complainant attempted to run, but "they threw [him] down" and "start[ed] hitting [him] down." One of the men "was struggling to get [complainant's] wallet" but complainant could not recall which of the two men

–2–

took his wallet "because [his] face was full of blood." Complainant testified that, once the men took his wallet, they ran "into the apartment [complex] close to where the gas tank" in front of the convenience store was located. Complainant then tried to stop the person who had talked with one of the men from driving away so that "we can get the arrest" but the car eventually drove off.

Complainant testified that, during the attack, he was "in fear of serious injury or that they might kill" him. He testified that he suffered cuts on his head so that his "face was covered in blood[,]" requiring stitches on his cheek and forehead and inside his mouth. He also suffered bruises and "[e]verything was swelled with blood." He testified that he was sixty-one years old at the time of trial, and the two men who attacked him were about twenty.

During direct examination of complainant, the State showed the jury a surveillance video from the store taken before, during, and after the aggravated robbery. The video depicted the events that complainant had described, but the faces of the assailants were not identifiable on the video. Complainant testified that the video depicted the location and proximity of the apartment complex to which the two perpetrators ran after the attack and that, "from where this [robbery] had happened, you're able to see the front gate area" of the apartment complex.[1]

Complainant also testified that the police called him to observe a lineup and that he "felt like [he was] able" to "identify the person with the gun" in the lineup. Complainant testified that, although he signed the back of two photographs—exhibits 3 and 5—to indicate that he identified the men in both photographs as the man with the gun, exhibit 5 depicted "the person that [he] ultimately identified as the defendant" and "the person that had the gun[.]"

The State played the videotape of the lineup for the jury. In the video, complainant first identified the person depicted in exhibit 3—who was not appellant—as the person who pointed a

---

[1] Complainant testified that his employer called the next day to inform him that his wallet had been recovered. He testified that he lost "probably $55" but that his "ID and those kind[s] of things" were still in the wallet.

–3–

gun, hit him, and stole his wallet.[2]  When complainant made this identification, he stated that he was "100% confident" that the person in exhibit 3 was the culprit based on "his face and the dreads[,]" meaning the dreadlocks in his hair.  But when shown exhibit 5, complainant clapped repeatedly and stated, "I misplaced the other one and this one" and "misidentified the other one." He recanted his identification of the person in exhibit 3.  According to complainant, exhibit 5 was "the perfect one," "the correct one," and "the best one."  He based his identification on "his face and the dreads . . . the hair."

After discussing the lineup on direct examination, the State asked complainant: "[I]s the person that you identified as the person who attacked you in that lineup, is that person present in the courtroom today?"  Complainant responded: "No.  The one with the gun is not here."

Dallas Police Officer Streeter testified that he was the first officer to arrive at the scene, and he spoke with complainant and witness Kenneth Mwangi, who was the security officer at the next-door apartment complex.  Streeter testified that the apartment complex where Mwangi worked and was standing was "really close to where the offense took place" and "was probably 10, 15 feet away."  Streeter testified that Mwangi was "able to describe what he saw pretty well[,]" that "[h]e was close" to the offense, and that he considered Mwangi an eyewitness. Streeter also testified that "[i]t was pretty well lit right there in that area" and "it was still fairly light out."

On cross examination, Streeter testified that "[t]he convenience store parking lot bumps right up to the driveway of the apartment complex" and that he met Mwangi where he was standing "probably halfway up the drive" that goes "into the entrance of the apartment

---

[2] Although the lineup did not concern identification of the second perpetrator, complainant identified the person depicted in another photograph in the lineup as "the one" who "hit [him] and took [his] wallet."

complex[.]" He also testified that he took an oral witness statement from Mwangi, and that it was the only witness statement the police obtained.

Mwangi testified that he was stationed in front of the gate to the apartment complex working as a security guard at the time of the incident and he was "able to observe that convenience store pretty much the whole time[.]" He testified that, on the evening that the robbery occurred, he heard a "surprise yell, yelling for help" that "sounded like someone was in distress[.]" He "moved closer to see what was going on" and determined that the sound was coming from the side of the convenience store. Mwangi testified that he had "a good view[,]" that there was nothing obstructing his view, and that, even though the lighting on the side of the convenience store was not as good as the lighting in front of the store, he was confident he could see what was happening and had "a clear view." Mwangi testified that he saw "a man on the ground . . . being stomped on by two young men" first by the side of the store and then in front of the store close to the gas pumps. He also testified that the suspect had "something wrapped in a white shirt" that he was using "to hit the man in the face when they were on the side of the building."

Mwangi then testified that, after the two men stopped attacking the third man, the two men "came running towards the building [he] was working in[.]" One man "hopped over the gate" to the apartment complex and the other man "was trying to open" the locked gate. Mwangi "was standing in front of" the gate. The man who had hopped over the gate opened it from the inside, and the two men "ran through the parking lot into the building." Mwangi testified that the one who was "trying to get through the gate" "touched" Mwangi as he was "trying to reach the handle." Mwangi testified that the two men were so close to him that "they could have made contact with" him, and that their efforts to get through the gate lasted "about six or seven seconds."

Mwangi testified that he did not recognize the person who hopped over the gate, but he did recognize the person who was let in the gate. He testified that "the weekend before" Mwangi had "seen him walking around the apartment[s]" while he "visit[ed] one of the tenant's daughters." Mwangi had told the man and woman that they could not "walk[] around talking loud" and "asked them to go outside[.]" Mwangi testified that he spoke with the man and woman for about a minute, that he saw them two or three times that day, and that the man was walking around with "one of the other tenant's daughters most of the afternoon."

Mwangi also testified that, about two weeks after the incident occurred while he was stationed again at the front gate of the apartment complex, he was "certain" that he saw one of the two men involved sitting and talking with another man outside the convenience store. After watching him for ten to fifteen minutes and watching a police patrol car pull up to the store, Mwangi called 911 to report that "one of the guys that assaulted somebody was sitting at the side of the building and there was a cop car there."

In the courtroom, Mwangi identified appellant as the person whom he saw "commit the offense" and whom he saw "later at that gas station[.]" Mwangi testified that he was "positive that this [was] the same person[,]" although he had "changed his appearance" because "[h]e had dreadlocks back then."

On cross examination, Mwangi testified that, about a week after he called the police to report that he saw one of the assailants by the convenience store, the police showed Mwangi a photograph of appellant, and Mwangi "said that was him."[3] Then, on direct examination, the prosecutor showed Mwangi another photograph of appellant, and Mwangi again testified that the photograph depicted "the person that [he] saw commit the offense" and that the photograph

---

[3] On cross examination, the investigator in the case testified that it was not "proper procedure" for the police "to go out to Mr. Mwangi and show him a photograph[.]" The investigator also testified that Mwangi did not cooperate with efforts to have Mwangi participate in a "proper photo lineup[.]"

depicted "how his hair looked at that time[.]" Mwangi also testified that, when he saw the man at the convenience store the second time, "he had a bandanna over his hair" and that Mwangi "could kind of recognize him with or without the hair."

## STANDARD OF REVIEW AND APPLICABLE LAW

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The jury as fact-finder exclusively determines the credibility and weight of the evidence. *See id.* Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.*

A person commits aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. TEX. PENAL CODE ANN. § 29.03(a)(2). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a)(2). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. *Id.* § 31.03(a) (West Supp. 2011). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

The testimony of a single eyewitness can be sufficient to support a conviction. *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971). The jury alone resolves inconsistencies or conflicts in the evidence, and the jury alone decides whether to believe eyewitness testimony. *Bradley v. State*, 359 S.W.3d 912, 917 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

Appellant argues that "[t]he evidence is insufficient to support the conviction due to lack of proof beyond a reasonable doubt of Appellant's identity as one of the perpetrators of the offense." According to appellant, because it was not possible to identify anyone involved in the aggravated robbery from the surveillance video, the State's case was founded "entirely" on the testimony of complainant and an eyewitness. Appellant argues that complainant's "questionable identification of Appellant from a photographic lineup" and "Mwangi's suspicious identification of Appellant as one of the attackers" "were flawed."

Appellant also argues that complainant's identification of appellant's photograph was "highly questionable, particularly because he first identified another photograph." Appellant claims that a "fair review" of the lineup and complainant's comments during the lineup leads to the conclusion that complainant "based his identification primarily on hairstyle" and not on his "recollection of specific facial features." Appellant argues that it was significant that complainant could not identify appellant in open court, which appellant claims was because appellant's hair was not in dreadlocks at trial.

Appellant argues that Mwangi's identification of appellant is "equally, if not more, suspect" because Mwangi exhibited "variable behavior," including his refusal to view a photographic lineup and his not directing the police to the apartment that appellant had visited, which was inconsistent with his "seeming willingness" "to call the attention of the police to Appellant." Appellant also contends that "Mwangi's identification of a single photograph" was "insufficient on its own" because it was "at odds with proper procedures for photographic lineups." Additionally, appellant argues that "[t]he jury obviously had issues with the State's

evidence" because the jury reached a verdict only after the trial court instructed them with an "Allen charge."[4]

The State argues that complainant's photo lineup identification and Mwangi's in-court identification of appellant were sufficient to prove appellant's identity as one of the perpetrators and to support his conviction. The State contends that "the jury was capable of determining what weight to assign [complainant's] identification" because the jury considered evidence that complainant "had recanted an earlier identification before settling on a subsequent photograph in the lineup" and observed complainant's "inability to identify Appellant in the courtroom." The State also argues that Mwangi's "in-court identification of Appellant as one of the robbers" was "direct evidence of Appellant's involvement."

We conclude that the evidence that appellant relies upon to argue that the State did not establish beyond a reasonable doubt that appellant was one of the robbers involves the credibility of the witnesses and conflicting testimony. We defer to the jury's credibility and weight determinations. *See Wise*, 364 S.W.3d at 903. After examining all of the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the offense of aggravated robbery, including that appellant committed the offense, beyond a reasonable doubt. *See Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."); *Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (holding complainant's testimony identifying appellant "standing alone" was sufficient to support conviction). We resolve appellant's first issue against him.

---

[4] "Allen charge" refers to an instruction from the court to a deadlocked jury encouraging them to strive to reach a verdict to avoid a mistrial. *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

**MODIFICATION OF JUDGMENT**

Appellant argues that the trial court's judgment should be modified to reflect the correct names of the prosecuting attorneys at trial. The State agrees that modification is needed. The record shows that the State was represented at trial by Stara Hendricson and Jerry Varney. The judgment incorrectly states that the State was represented by Sneha Patel. We sustain appellant's second issue. We modify the trial court's judgment to reflect that Stara Hendricson and Jerry Varney were the prosecuting attorneys in the trial court. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

We affirm the trial court's judgment as modified.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47

120294F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ADRIAN RACHOD DRUMMOND,
Appellant

No. 05-12-00294-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-58574-N.
Opinion delivered by Justice Lang-Miers,
Justices Murphy and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to reflect that Stara Hendricson and Jerry Varney were the prosecuting attorneys in the trial court.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 28th day of May, 2013.

/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE